UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BAYER AG,<br><br>                      Plaintiff,<br><br>                v.<br><br>JANSSEN PHARMACEUTICALS, INC.,<br><br>                      Defendant. | Case No. 1:25-cv-8573<br><br>**COMPLAINT** |

By and through its attorneys, Plaintiff Bayer AG ("Bayer") brings this action against Janssen Pharmaceuticals, Inc. d/b/a Johnson & Johnson Innovative Medicine ("J&J") and hereby alleges as follows:

## NATURE OF ACTION

1. This is an action to enforce J&J's contractual obligation to use commercially reasonable efforts to promote Xarelto, a hugely successful anticoagulant medication discovered and developed by Bayer and licensed to J&J in the United States. Flouting the terms of its contract with Bayer and standard industry practice, J&J slashed and then eliminated its entire in-person sales force for Xarelto in the United States—without consulting, or even informing, Bayer. J&J's breach has deprived and will continue to deprive Bayer of royalties due under the parties' agreement while saving J&J significant sales and marketing costs. Bayer brings this action to enforce the parties' contract and prevent J&J's grab for an unjustified windfall.

2. Xarelto is a Factor Xa anticoagulant medication, commonly known as a "blood thinner," used to treat and prevent blood clots and reduce the risk of strokes. Bayer first discovered rivaroxaban, the active ingredient in Xarelto, in 1999 and spent the next decade conducting clinical trials for Xarelto. When it was approved by the FDA in 2011, Xarelto was one of the first novel

oral anticoagulants introduced in the United States in more than 50 years, sparking a competitive and promotion-sensitive market for these medications.

3. In 2005, J&J's predecessor, Ortho-McNeil Pharmaceutical, Inc., and Bayer entered into a Collaborative Development and License Agreement (the "CDLA") to further develop and market Xarelto. Under the CDLA, Bayer granted J&J an exclusive license to sell Xarelto in the United States in exchange for J&J's agreement to collaborate with Bayer on U.S. sales and marketing efforts and to pay Bayer royalties on U.S. sales of Xarelto. Because J&J is responsible for those sales and marketing efforts, under the CDLA, J&J retains most revenues from Xarelto's sales in the United States.

4. In the CDLA, J&J committed to use "Commercially Reasonable Efforts" to market Xarelto in the United States. The parties expressly agreed to the "Minimum Efforts" J&J would make to comply with its Commercially Reasonable Efforts obligation. These included using sales representatives to perform face-to-face meetings with healthcare providers capable of writing prescriptions for Xarelto—a practice known as "in-person detailing"—at a level commensurate with the efforts of a reasonable global pharmaceutical company promoting its own similar product in the United States. The parties took pains to define what activities qualified as in-person detailing and repeatedly referenced and reinforced J&J's in-person detailing obligations throughout the CDLA, including by requiring J&J to share with Bayer marketing plans that set forth its planned in-person detailing efforts.

5. The parties included these requirements in the CDLA because they understood the importance of in-person detailing for increasing and maintaining drug sales. In-person detailing is an essential marketing tool used by pharmaceutical companies to promote their products. In-person detailing is more effective in driving demand for branded drugs than other marketing approaches,

such as direct-to-consumer advertising and advertising in medical journals. When sales representatives speak directly with medical professionals, those professionals are more likely to learn and understand the benefits and safety profile of the promoted drug and are in turn more likely to prescribe the drug to their patients. Because in-person detailing has been seen to impact sales of branded drugs more than other types of marketing approaches, pharmaceutical companies typically invest a significant proportion of their promotional spend on in-person detailing compared to other advertising or promotional methods, particularly in markets with multiple competitors still under patent.

6. For nearly two decades after the signing of the CDLA, Bayer and J&J's partnership was a commercial success. In its early years, Xarelto regularly generated hundreds of millions of U.S. sales per year. Since 2016, Xarelto has generated approximately $600 million per quarter in U.S. sales. Bayer anticipated that Xarelto would maintain significant sales potential until at least 2027.

7. J&J and Bayer's partnership began to unravel in 2022. At the end of that year, J&J cut Xarelto's in-person sales force by over 70%, reducing the number of individuals in-person detailing Xarelto from 1,198 to 345. J&J did not inform Bayer of this decision beforehand. It did not tell its business partner until November 15, 2023, when Bayer asked J&J about an industry report suggesting that Xarelto's sales force had declined. At that meeting, Bayer requested that J&J communicate its plans for Xarelto more proactively in the future and specifically asked J&J to inform Bayer in advance of any adjustments to Xarelto's sales force.

8. Then, in September 2024, Bayer learned from a public news report that J&J had unilaterally decided to terminate its entire Xarelto sales force and abandon all in-person detailing efforts for Xarelto. J&J's announcement was an effective admission to the market that J&J was

abandoning Xarelto, which J&J's and Bayer's competitors understood. A few months later, Bristol Myers Squibb, the manufacturer of Xarelto's major competitor, Eliquis, stated in its Q4 2024 earnings call that it expected double-digit growth for Eliquis, in part because J&J's decision to take Xarelto "out of the market" presented a "great opportunity" for Eliquis.

9. Stunned that its business partner publicly had announced this change—again without any warning or consultation—Bayer reached out to J&J with surprise and concern. At meetings in October and November 2024, J&J confirmed that it intended to cease all in-person detailing for Xarelto, largely refused to answer Bayer's questions about the decision, and stated that it had conducted analyses of Xarelto's sales and marketing trends which supposedly supported its decision, but which it had not shared or discussed with Bayer. Even though Bayer raised concerns with this analysis and the implications of J&J's decision, J&J had already terminated or was in the process of terminating Xarelto's entire in-person detailing program by November 2024.

10. J&J breached its obligations under the CDLA. Under the "Minimum Efforts" provision of the CDLA, J&J is obligated to conduct in-person detailing efforts for Xarelto at a level commensurate with the efforts of a reasonable global pharmaceutical company promoting its own similar product in the United States. Absent competing considerations not present here, most pharmaceutical companies continue in-person detailing for their drugs up to, and often beyond, the moment when a drug's patent expires and a generic or biosimilar competitor enters the market, sometimes referred to as loss of exclusivity. Bristol Myers Squibb, for instance, has for years retained a sales force of over 1,000 sales representatives conducting in-person details for Eliquis—Xarelto's major competitor.

11. By abandoning its affirmative sales and marketing obligations, J&J helped itself to the CDLA's benefits—a disproportionately large share of the revenue from Xarelto sales in the

United States—without incurring the cost of sales and marketing that it committed to undertake. Absent J&J's breach, Xarelto would have higher U.S. sales, generating significant positive returns from J&J's investment in its sales force and higher royalty payments for Bayer. J&J benefits from its violation of the CDLA by avoiding significant sales and marketing costs, while Bayer simply loses royalties.

## THE PARTIES

12. Plaintiff Bayer AG is a global pharmaceutical and biomedical company incorporated in Germany and headquartered in Leverkusen, Germany. It is the successor entity to Bayer Healthcare AG, the original signatory to the CDLA.

13. Defendant Janssen Pharmaceuticals, Inc. is a global pharmaceutical company incorporated in Pennsylvania and headquartered in New Jersey. It is the successor entity of Ortho-McNeil Pharmaceutical, Inc., the original signatory to the CDLA. In 2011, Ortho-McNeil Pharmaceutical, Inc. merged with Janssen Pharmaceuticals and began operating as Janssen Pharmaceuticals, Inc.

## JURISDICTION, VENUE, AND GOVERNING LAW

14. This Court has personal jurisdiction over J&J pursuant to Section 16.6 of the CDLA in which J&J agreed to "submit to the exclusive jurisdiction of the federal courts of the Borough of Manhattan in the State of New York … for the purposes of any action or proceeding arising out of or in connection with" the CDLA.

15. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000), exclusive of interests and costs, and complete diversity of citizenship between the parties exists because Bayer is a citizen of Germany, while J&J is a citizen of Pennsylvania and New Jersey.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3). Pursuant to Section 16.6 of the CDLA, Bayer and J&J agreed to submit to the exclusive venue of any federal court in Manhattan, New York for the purposes of any action or proceeding arising out of or in connection with the CDLA.

17. Pursuant to Section 16.6 of the CDLA, New York law applies to this action.

## FACTUAL ALLEGATIONS

### I. Background on Xarelto

18. Bayer discovered rivaroxaban, the active ingredient of Xarelto, in 1999. It spent the next decade conducting clinical trials for Xarelto. Xarelto is an oral, direct Factor Xa inhibitor that acts as an anticoagulant, commonly known as a blood thinner. Factor Xa is a key enzyme in the formation of blood clots, a natural part of the body's healing process that can become dangerous when they form inappropriately or travel to other parts of the body, such as the lungs or arteries. Xarelto works by blocking the activity of Factor Xa. It is used to treat and prevent blood clots that are related to certain conditions involving the heart and blood vessels.

19. Xarelto was first approved by the FDA in July 2011 to prevent deep vein thrombosis in patients undergoing knee or hip replacement surgery. As the first approved Factor Xa inhibitor, and one of the first novel oral anticoagulants introduced in the United States in more than 50 years, Xarelto quickly became one of the top oral anticoagulants in the United States.

20. As of today, Xarelto has been approved for a total of ten indications in the United States, including, among others, for the treatment and prevention of blood clots in pediatric patients following the Fontan procedure, for the prevention of blood clots in certain adults hospitalized for an acute illness and after discharge, and for reducing the risk of stroke and blood clots in certain adults who have a medical condition called atrial fibrillation.

21. Since Xarelto first received FDA approval, the drug has been used to treat serious, life-threatening medical conditions and has been hugely profitable for Bayer and J&J. In 2012, the first year that Xarelto entered the market, J&J and Bayer made $239 million in revenue from U.S. sales of the drug. In 2017, Xarelto reached $2.5 billion in sales in the United States.

22. Bayer holds several patents for Xarelto and its various indications, both globally and in the United States. While Bayer's U.S. patent for Xarelto's main compound (rivaroxaban) expired in February 2025, Bayer still holds other patents for Xarelto, including its once-daily tablet, meaning that most of Xarelto's U.S. market value remains under patent. Bayer anticipated that Xarelto would continue to generate significant value through at least 2027.

## II.     J&J's Obligations Under the CDLA

23. On October 1, 2005, Bayer and J&J entered into the CDLA to collaborate on developing and marketing Xarelto in the United States. This agreement marked the start of a decades-long partnership between Bayer and J&J.

24. Under the CDLA, Bayer granted J&J exclusive licensing rights to market and sell Xarelto in the United States. In exchange, J&J took on responsibility for all sales and marketing activities for Xarelto in the United States. When the parties negotiated the CDLA, Bayer agreed that J&J could keep a large share of the revenues from U.S. sales of Xarelto because J&J bound itself to significant sales and marketing obligations.

25. A crucial component of J&J's sales and marketing obligations for Xarelto is in-person detailing. In-person detailing is a process wherein a pharmaceutical sales representative presents the features and the risk-benefit profiles of a drug to a medical professional in an in-person, one-on-one setting. Pharmaceutical companies use in-person detailing to educate doctors and as a marketing tool to advertise their products.

26. In-person detailing is more effective at generating sales for pharmaceutical drugs, particularly prescription drugs, than other marketing approaches, such as direct-to-consumer advertising and write-ups in medical journals. Medical professionals, who decide which drugs to prescribe, can more readily learn about and understand the benefits and features of a promoted drug from face-to-face contact with a drug manufacturer's sales representatives, even if they would not seek out information about a particular drug on their own.

27. In-person detailing also gives physicians the opportunity to ask questions about the drug to qualified individuals who are well-versed in all aspects of the drug, including its safety and benefit profile and its approved uses. When physicians learn about a drug through in-person detailing, studies have shown they are more likely to keep that drug top of mind and are in turn more likely to prescribe the drug to appropriate patients. As a result, pharmaceutical companies typically invest a significant proportion of their promotional spend on in-person detailing compared to other marketing strategies and tactics for branded drugs, particularly in markets with multiple competitors still under patent.

28. The CDLA expressly memorializes J&J's obligation to engage in in-person detailing efforts. J&J agreed to use "Commercially Reasonable Efforts" to promote, market, and sell Xarelto in the United States.

29. The CDLA defines Commercially Reasonable Efforts as follows:

> [T]hat degree of skill, effort, expertise, and resources normally used by a global pharmaceutical company, with respect to fulfilling a particular development or marketing activity for a compound owned by it or to which it has rights, which is of similar market potential at a similar stage in its product life relative to the Compound and the Product, taking into account the competitiveness of the marketplace, the proprietary position of the compound, the regulatory structure involved, the profitability of the applicable products, and other relevant factors including, without limitation, technical, legal, scientific or medical factors.

30. The CDLA specifies the "Minimum Efforts" J&J must make to comply with its CRE obligation:

> J&J agrees to make such Commercialization Expenditures and perform that level of Primary and Secondary Detailing, for each Calendar Year, as would reasonably be expected of a global pharmaceutical company promoting its own similar product of similar market potential at a similar stage in the product life cycle in the USA at a commercially competitive level.

31. The CDLA defines "Detail," Primary Detail," and "Secondary Detail," which make clear that detailing requires "a face-to-face contact … in which a J&J sales representative … makes a presentation … to a medical professional with prescribing authority who is a member of the Target Audience," "where no more than three (3) products are presented."

32. Other provisions of the CDLA reinforce J&J's obligation to engage in in-person detailing efforts for Xarelto in the United States. For instance, the CDLA requires J&J to submit to a Joint Steering Committee, comprised of Bayer and J&J individuals, "marketing plans" for Xarelto in the United States, including a statement of "annual anticipated Primary and Secondary Detailing with respect to each Development Indication." The CDLA also requires J&J to "promptly disclose to [Bayer] all significant information of which it becomes aware … which it reasonably believes will have a material commercial impact on the detailing … of [Xarelto] in the USA…." And the CDLA requires J&J to "keep accurate and complete records of each Detail carried out by it under this Agreement … for the sole purpose of verifying the number and type of Details."

### III. J&J Breaches Its Detailing Obligations Under the CDLA

33. At the end of 2022, J&J unilaterally cut its Xarelto in-person sales force by over 70%, from 1,198 representatives to 345. J&J did not tell Bayer about this abrupt reduction. Bayer

9

learned about it from an industry report, which Bayer then confirmed with J&J at a November 15, 2023 meeting.

34. J&J's belated disclosure violated its obligation to promptly disclose information that has "a material commercial impact on the detailing, promotion, marketing and sale" of Xarelto in the United States. Bayer, seeking more proactive communication from its business partner, requested that J&J share plans for any further changes to Xarelto's in-person detailing efforts in advance, as required by the CDLA.

35. J&J then terminated all in-person detailing efforts for Xarelto in the United States—without notice to Bayer. Bayer only learned of this complete sales force elimination on September 25, 2024, when J&J confirmed a public report that it was winding down its sales force for Xarelto, vaguely stating, "we must adapt and evolve our businesses in the midst of a complex and rapidly changing external environment."

36. J&J's actions violated its disclosure obligations under the CDLA, which require that any press release, news release, or other public announcement regarding Xarelto's marketing must first be reviewed and approved in writing by both J&J and Bayer.

37. Bayer quickly reached out to J&J to express its concern, calling an ad-hoc meeting of Xarelto's Joint Steering Committee on October 15, 2024. At that meeting, J&J confirmed that it was transitioning Xarelto internally to a new group as part of a corporate restructuring, and that it was employing a "strategy that focuses on non-personal promotion rather than a traditional sales force."

38. At Bayer's request, the parties met again on November 20, 2024. Bayer posed a series of questions about J&J's plans for Xarelto and its unilateral decision to terminate the sales force, which J&J largely refused to answer. J&J did reveal, however, that for the past year it had

been conducting analyses of Xarelto's "market share trends and promotional sensitivities." J&J had not told Bayer of that analysis before, and Bayer quickly pointed out that it suffered from several apparent infirmities. Bayer and J&J met several more times over the next weeks and months, but J&J offered only a series of weak rationalizations for its decision to cease in-person detailing for Xarelto.

### IV. J&J's Behavior Is Contrary to Industry Practice

39. The CDLA requires J&J to act in marketing Xarelto as would a reasonable global pharmaceutical company promoting its own similar product of similar market potential at a similar stage in the product life cycle in the United States. J&J's decision to dramatically reduce and then wholly abandon in-person detailing efforts for Xarelto—when Bayer would still hold its patents exclusively for years to come—violates that standard.

40. The global pharmaceutical company Bristol Myers Squibb, for example, continues in-person detailing for its drug Eliquis—Xarelto's major competitor in the treatment of blood clots and stroke risks—even as Eliquis's loss of exclusivity approaches. Contrary to J&J's treatment of Xarelto, Bristol Myers Squibb maintains an in-person sales force with over 1,000 representatives for Eliquis. Sales of Eliquis continue to grow, due in part to Bristol Myers Squibb's commitment to in-person detailing the drug.

41. Bristol Myers Squibb also continued to promote its drug Revlimid with in-person detailing for over a year after its loss of exclusivity in March 2022. Like Xarelto, Revlimid maintained consistently strong sales before its loss of exclusivity and Bristol Myers Squibb continued to generate strong sales for Revlimid even during the year after its loss of exclusivity, due in part to Bristol Myers Squibb's commitment to in-person detailing of the drug.

42. Bristol Myers Squibb also continues to detail its drug Yervoy even though its patent expired on or around March 2025. In contrast to J&J's treatment of Xarelto, Bristol Myers Squibb

maintained a consistently strong sales force for Yervoy and sharply increased the number of sales representatives once its patent expired. Sales of Yervoy have continued to grow, due in part to Bristol Myers Squibb's commitment to in-person detailing the drug.

43.     The global pharmaceutical company Biogen continued in-person detailing for its drug Tecfidera through 2020, on or around its loss of exclusivity when its patent expired and a generic competitor entered the market. In contrast to J&J's treatment of Xarelto, Biogen maintained a consistent number of in-person sales representatives to in-person detail Tecfidera before its loss of exclusivity. Sales of Tecfidera remained stable until loss of exclusivity, due in part to Biogen's commitment to in-person detailing the drug until that point.

44.     The global pharmaceutical company Sanofi continued in-person detailing for its drug Aubagio through 2023, on or around its loss of exclusivity when its first generic competitor entered the market. In contrast to J&J's treatment of Xarelto, Sanofi maintained a consistent number of in-person sales representatives to in-person detail Aubagio before its loss of exclusivity. Sales of Aubagio remained stable until loss of exclusivity, due in part to Sanofi's commitment to in-person detailing the drug until that point.

45.     The global pharmaceutical company Astellas continued in-person detailing for its drug Myrbetriq through 2024, on or around when its patent expired. In contrast to J&J's treatment of Xarelto, Astellas maintained a consistent number of in-person sales representatives to in-person detail Myrbetriq before its loss of exclusivity. Sales of Myrbetriq remained stable until its loss of exclusivity, due in part to Astellas' commitment to in-person detailing the drug until that point.

46.     The global pharmaceutical company Gilead Sciences continued in-person detailing for its drug Truvada through 2019, on or around when its patent expired. In contrast to J&J's treatment of Xarelto, Gilead Sciences maintained and increased its in-person sales force for in-

person detailing of Truvada before its loss of exclusivity. Sales of Truvada remained stable until its loss of exclusivity, due in part to Gilead Sciences' commitment to in-person detailing the drug until that point.

47. The global pharmaceutical company UCB continued in-person detailing for its drug Vimpat through 2022, on or around its loss of exclusivity when its first generic competitor entered the market. In contrast to J&J's treatment of Xarelto, UCB maintained a consistent number of sales representatives to in-person detail Vimpat before its loss of exclusivity. Sales of Vimpat continued to grow through loss of exclusivity, due in part to UCB's commitment to in-person detailing the drug until that point.

48. The global pharmaceutical company AstraZeneca continues in-person detailing Farxiga even as its loss of exclusivity approaches. In contrast to J&J's treatment of Xarelto, Astra-Zeneca maintains a consistent number of approximately 2,000 sales representatives to in-person detail Farxiga. Sales of Farxiga remain strong, due in part to AstraZeneca's commitment to in-person detailing the drug.

49. The global pharmaceutical company GlaxoSmithKline continues in-person detailing its drug Benlysta, even though its patent expired on or around March 2025. In contrast to J&J's treatment of Xarelto, GlaxoSmithKline maintains a relatively large number of sales representatives to in-person detail Benlysta. Sales of Benlysta continue to grow, due in part to GlaxoSmithKline's commitment to in-person detailing the drug.

50. GlaxoSmithKline also continues in-person detailing its drug Cabenuva even as its loss of exclusivity approaches. In contrast to J&J's treatment of Xarelto, GlaxoSmithKline has been steadily increasing the number of sales representatives to in-person detail Cabenuva. Sales of

Cabenuva continue to grow, due in part to GlaxoSmithKline's commitment to in-person detailing the drug.

51. Even compared against its own efforts, J&J's decision to dramatically reduce and ultimately abandon in-person detailing for Xarelto prior to its loss of exclusivity is abnormal. J&J regularly maintains in-person detailing for its own products up to and beyond loss of exclusivity.

52. J&J continued in-person detailing for Remicade for approximately two years after its loss of exclusivity on or around October 2016. Sales of Remicade remained relatively strong after that date: Nearly one year later, in the third quarter of 2017, Remicade posted one of its highest quarterly sales reports ever.

53. J&J also continues to promote Stelara with in-person detailing, even though its loss of exclusivity occurred on or around October 2023. Rather than reduce its in-person sales force after Stelara's loss of exclusivity, J&J increased its in-person sales force for Stelara by approximately 20%. Stelara remains successful to this day: In the second quarter of 2024, Stelara experienced its second-highest sales quarter ever.

54. J&J also continued in-person detailing for Zytiga through 2018, on or around its loss of exclusivity when its patent expired and a generic competitor entered the market. J&J actually increased its sales force that performed in-person detailing for Zytiga in the two years prior to its loss of exclusivity. Sales of Zytiga surged before its loss of exclusivity, due in part to J&J's commitment to in-person detailing the drug until that point.

55. By prematurely terminating its in-person sales force for Xarelto, J&J effectively pulled Xarelto out of the United States market for Factor Xa inhibitors. Xarelto's competitors cheered the move: On a quarterly earnings call in early 2025—after J&J confirmed it was terminating in-person detailing for Xarelto—Bristol Myers Squibb explained that J&J's decision to stop

in-person detailing for Xarelto presented a "great opportunity" to drive sales of Xarelto's competitor Eliquis. Because Bristol Myers Squibb continues to provide in-person detailing for Eliquis with over 1,000 sales representatives, J&J's decision to cease detailing Xarelto all but ensures that Eliquis, not Xarelto, will be top-of-mind for healthcare providers as they treat patients for blood clots and risk of stroke.

### V. Bayer Has Been Damaged by J&J's Breach

56. As a direct result of J&J's decision to terminate its in-person sales force for Xarelto, Bayer has suffered and will continue to suffer decreased royalties from Xarelto's sales in the U.S. market. But for J&J's termination of in-person detailing for Xarelto, J&J would have sold more units of Xarelto and would have been obligated to pay Bayer royalties on those sales, as agreed in the CDLA.

57. While J&J has tried to justify its decision to terminate in-person detailing efforts for Xarelto by claiming that Xarelto is not sensitive to in-person detailing, J&J's own data on market share trends shows that medical professionals are more likely to prescribe Xarelto when there are face-to-face sales force visits. J&J's investment in Xarelto's sales force thus would have generated significant positive returns.

58. Although J&J has continued other marketing strategies for Xarelto, such as maintaining patient support services, providing samples, and hosting events, those efforts cannot make up for the loss of in-person detailing.

59. Because of J&J's termination of Xarelto's sales force, physicians have started writing fewer prescriptions of Xarelto. The number of new patients prescribed Xarelto has dropped dramatically since the fourth quarter of 2022, when J&J slashed its in-person sales force by 70%. This data suggests that physicians are increasingly turning away from Xarelto and toward its

competitors, who have continued in-person detailing. J&J has acknowledged Xarelto's "continued share declines."

60. By terminating in-person detailing for Xarelto in violation of the CDLA, J&J reaps the benefits of the contract's arrangement while failing to hold up its end of the bargain. Any decrease in sales directly affects Bayer's revenues, because Bayer receives royalties based on the total amount of annual net sales. J&J's losses from decreased sales, however, are offset by the savings it gains from refusing to perform its duties under the contract. By terminating its in-person sales force, J&J has thus claimed for itself a greater portion of the value of the parties' partnership, breaching the CDLA and damaging Bayer.

## COUNT I
### Declaratory Judgment

61. Bayer incorporates by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

62. Bayer and J&J entered into the CDLA. The CDLA is a binding contract.

63. Bayer performed all its obligations under the CDLA.

64. An actual controversy exists between Bayer and J&J relating to their legal rights, duties, and obligations under the CDLA.

65. J&J has effectively taken the position that the Commercially Reasonable Efforts and Minimum Efforts provisions in the CDLA are invalid, unenforceable, and/or inapplicable to its early abandonment of in-person detailing efforts for Xarelto in the United States.

66. J&J has breached the CDLA by not using Commercially Reasonable Efforts to market Xarelto.

67. Declaratory relief will resolve the legal issues between the parties regarding the Commercially Reasonable Efforts and Minimum Efforts provisions of the CDLA. In so doing,

declaratory relief will allow the parties to adjust their conduct going forward to limit or eliminate future damages that are likely to accrue in the form of decreased royalties to Bayer.

68. Bayer is therefore entitled to a declaratory judgment that J&J has breached the CDLA.

## COUNT II
## Breach of Contract

69. Bayer incorporates by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

70. Bayer and J&J entered into the CDLA. The CDLA is a binding contract.

71. Bayer and J&J entered into the CDLA for the purpose of establishing and describing the parties' relative rights and obligations with respect to the development and sales and marketing of Xarelto in the United States.

72. The CDLA was supported by mutual promises and valuable consideration.

73. Bayer has complied with and performed all its obligations under the CDLA, to the benefit of J&J.

74. The CDLA requires J&J to use Commercially Reasonable Efforts to market Xarelto in the United States, in particular by undertaking a set of "Minimum Efforts" that include in-person detailing.

75. J&J breached the CDLA and failed to use Commercially Reasonable Efforts or Minimum Efforts to market Xarelto when it drastically reduced its in-person sales force for Xarelto at the end of 2022 and terminated its entire in-person sales force for Xarelto in November 2024.

76. As a direct and proximate result of J&J's conduct in breach of the CDLA, Bayer has suffered and will continue to suffer substantial damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief as follows:

First, a declaratory judgment pursuant to 28 U.S.C. § 2201 that J&J has breached its obligations under Sections 5.1 and 5.1(b) of the CDLA by reducing and terminating its entire in-person sales force for Xarelto.

Second, an award of monetary damages in an amount to be proven at trial, and pre-judgment interest thereon.

Third, such additional relief as the Court deems proper.


Dated:  New York, New York
        October 16, 2025

Respectfully submitted,

SELENDY GAY PLLC

By:  /s/    *Oscar Shine*
Oscar Shine
Meredith Nelson
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
oshine@selendygay.com
mnelson@selendygay.com

*Attorneys for Plaintiff Bayer AG*